STATE of Missouri, Respondent,

v.

Paige SPEARS, Appellant.

Paige SPEARS, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 57937, 59827.

Missouri Court of Appeals, Eastern District, Division Four.

Dec. 24, 1991.

Judith C. LaRose, Columbia, for appellant.

William L. Webster, Atty. Gen., Joan F. Edwards, Asst. Atty. Gen., Jefferson City, for respondent.

KAROHL, Judge.

Defendant appeals conviction of first degree robbery, § 569.020 RSMo 1986, and armed criminal action, § 571.015 RSMo 1986, as well as from the denial of his Rule 29.15 motion for post conviction relief.

The court sentenced defendant as a prior, persistent and class X offender to life imprisonment for robbery and a concurrent thirty years for armed criminal action. Defendant has briefed only direct appeal issues. He alleges the court erred in overruling his objections to: (1) the state's exercise of its peremptory challenges against black venirepersons; (2) statements made by the prosecutor in closing argument; and (3) allowing in-court identifications made by eye-witnesses. We affirm.

Defendant does not challenge the sufficiency of the evidence. The facts viewed in the light most favorable to the verdict indicate at approximately 4:25 p.m. on November 12, 1988, defendant and co-defendant Michael Clark walked into Mack's Package Liquor Store in Ferguson, Missouri. Virginia Connor was the only employee on duty. The men headed for the beer coolers. Then they turned around and asked Ms. Connor where the wine coolers were located. After they walked over to the wine coolers, the men faced Ms. Connor and inquired about prices. The men chose some wine coolers and proceeded to the cash register where Ms. Connor was stationed. As Ms. Connor began to make change for the men, defendant put his hand in the cash register drawer and co-defendant pointed a handgun at Ms. Connor. Both men smiled. Defendant directed Ms. Connor to lie down on the floor. The next thing Ms. Connor heard was the door bell.

John Walker, a customer, entered the liquor store. The first thing he observed was a pair of leather gloves laying on the floor. Walker asked co-defendant if the gloves belonged to him. Co-defendant thanked Walker and exited the store with defendant. Walker took beer out of a cooler and approached the check-out counter. Ms. Connor stood up and explained the store had just been robbed.

Walker bolted to the door and yelled at the men to stop. The men, who were forty-five feet away, stopped, turned around and faced Walker. Walker went back into the liquor store intending to call 911. However, the alarm was occupying the telephone line. Walker left the store again.

When he got to the corner of the liquor store, he saw the men again at a range of one hundred and fifty feet. They turned around again and began walking towards Walker. Walker ducked into a restaurant and called 911. While he was describing the men to the dispatcher, a police car pulled up. Walker abandoned the telephone. He described the men to the officer in the patrol car and pointed him in the direction of the men.

The emergency call came over the police radio at 4:29 p.m. Officer Doedli spotted two men who fit the description walking along railroad tracks. When Doedli identified himself and advised the men to halt, they bolted. They were apprehended at separate locations, both within a short distance of the liquor store. Once the defendants were both in custody and brought to the same location, Officer Bortz stopped by the liquor store and picked up witnesses Connor and Walker. Officer Bortz "advised them I had a couple subjects I'd like them to take a look at." The show-up happened on Marie Avenue.

Upon their arrival at Marie Avenue, Connor identified both defendants positively and immediately. Walker positively placed co-defendant in and outside the store. Walker placed defendant outside the store but could not say whether defendant was inside the store. However, he stated the second man inside the store was dressed identical to defendant. At 4:47 p.m. the police transported defendants to the station for processing. The police confiscated $476 in cash from defendant and $156.88 from co-defendant. The liquor store owner testified $629.07 in cash and coin was stolen from his store. The beer and wine coolers were never found.

I

■ Defendant alleges the court "erred in overruling [his] objections to the state's exercise of one of its peremptory challenges against Lloyd Newsom and further abused its discretion in allowing the trial to proceed after the state had used five of its peremptory challenges to exclude blacks from the jury...." Defendant further al-

leges "the state failed to rebut the presumption of discrimination with neutral explanations for exercising its challenges that were clear and specific, legitimate and related to this case, and the record demonstrates that the explanations were merely pretextual and were not legitimate." In the argument portion of his brief, defendant complains only of the explanation offered by the state for striking venireperson Lloyd Newsom. He does not challenge all of the explanations given.

After the state exercised its peremptory challenges, defendant made a *Batson* objection. Defense counsel stated defendant was a black man, and the state used peremptory challenges to strike four out of five black venirepersons from the jury and the sole black alternative juror. Counsel for co-defendant informed the court, the first trial resulted in a hung jury with eight white jurors voting guilty, three black jurors not guilty and one black juror refused to deliberate. Defense counsel observed: "I think there's a definite advantage in the prosecution's mind to be gained from striking blacks from this jury."

The court asked the prosecutor to give reasons for striking the black venirepersons. The prosecutor offered the following explanation for striking Newsom.

I struck him because during the court on yesterday there were no responses at all to any questions. And then when he was asked today ... I couldn't get a response out of him or he did say no to several of my questions. This circuit court trial juror list that we were given by the ... the clerk's office, says that he's related to a law enforcement officer. And I tried to ask him about that and why this was on here, and he said he's not, but he didn't go on to explain. And I felt that during the course of his voir dire with [defense counsel] he appeared to discuss things more openly with [defense counsel] than he did myself. I couldn't get any responses out of him. And he didn't appear to be—to me to be attentive to what I was asking when I was asking questions.

With regard to juror number—and there are similarly some—juror number 5 was also struck because he didn't answer any of my questions either. And he is a white juror, and I struck him likewise. In response, defense counsel explained he asked Newsom more particular questions and that is why Newsom was more responsive to him than to the prosecutor.

After hearing all of the prosecutor's explanations the court ruled:

With respect to number 4, Mr. Newsom, I believe [prosecutor's] reason specifically that he wasn't responsive to her, or even more specifically he was more responsive to [defense counsel] is a legitimate reason to strike him and a racially neutral reason, because that's actually in my experience probably the most common reason to strike a juror, that you think a juror is identifying with some particular attorney other than yourself. And for those reasons, in the Court's observations, the Court finds that [prosecutor] has given a racially neutral reason by the fact that he was in fact receptive to [defense counsel] and not as receptive to her, and that's a racially neutral reason.

We note the court did not accept all of prosecutor's explanations as race neutral. Specifically, the court did not allow the state's peremptory strike of Mr. Allen. The court rejected the reason provided that Allen was slow to respond to questioning and stated he had been a witness to prejudice. Furthermore, the court stated for the record:

I've worked with [prosecutor] up in court quite extensively, although not specifically with jury trials I don't believe. But she's been assigned to this court on a number of occasions, and the Court has known [prosecutor] from working with her in the past, and has certainly always found her to be extremely sincere. And the Court without question can say I've never heard any kind of a hint of prejudice from [prosecutor] in any regard.

Defendant did respond to the neutral reason given by the state. Defense counsel argued Newsom was equally receptive to

both himself and the prosecutor and the reason Newsom was not equally responsive was due to defense counsel's specific questioning of him. Prosecutor responded: "It was responsive and receptive ... I got a no, a one-syllable answer. You got explanations." The court replied: "I saw his responses and I think that's a legitimate reason...."

We find the court did not err by accepting the state's neutral explanation for striking Newsom as legitimate. In *Hernandez v. New York*, — U.S. —, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991), the United States Supreme Court defined "a neutral explanation" to mean "an explanation based on something other than the race of the juror." "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* The prosecutor here explained the challenge did not rest upon an intention to exclude black jurors, but upon Newsom's responsiveness and reception to defense counsel and his lack thereof towards her.

In *State v. Antwine*, 743 S.W.2d 51, 64 (Mo. banc 1987) we learned:

> By their very nature, peremptory challenges require subjective evaluations of veniremen by counsel. Counsel must rely upon perceptions of attitudes based upon demeanor, gender, ethnic background, employment, marital status, age, economic status, social position, religion, and many other fundamental background facts.... *Batson* declares unacceptable only those perceptions based upon race. In so doing, *Batson* requires trial judges to measure the subjective decisions of counsel against a constitutional standard.... *Batson* thus requires the trial judge to embrace a participatory role in voir dire, noting the subtle nuance of both verbal and nonverbal communication from each member of the venire and from the prosecutor himself.

Here, the court confirmed the prosecutor's perceptions. The court had the advantage of viewing the nonverbal communication between Newsom and defense counsel and between Newsom and the prosecu-

tor. We give the trial court great deference in its determination of creditability. *Id.* at 66.

■ Additionally, the court considered its prior experience with the prosecutor and vouched for her integrity. A court's personal experience with the prosecutor is a factor to be considered under *Antwine*, 743 S.W.2d at 65. Finally, the prosecutor struck a similarly situated white venireperson who was unresponsive and unreceptive to questioning. This is another fact to be considered. *Id.* Against this analysis, the trial court's conclusion is not clearly erroneous. Point denied.

## II

■ Defendant alleges the court erred in overruling his objections during closing argument on the grounds the state degraded defense counsel, impermissibly shifted the burden of proof to him, and personalized to the jury when the prosecutor argued: (a) it was defense counsel's job to confuse the jury; (b) the jury should be offended by the argument of defense counsel that this is a racial case; and (c) the jury should ask themselves whether they would cash their paychecks in the denominations found on defendant. Only the first argument is preserved for review. Defendant did not object to the remaining two arguments in his motion for new trial. Thus, we review them for plain error. Rule 30.20.

Defendant did not testify at trial. He called one witness, Debbie Wuellner. Wuellner was the payroll administrator at Mitchell Murch Maintenance Management. Both defendant and co-defendant were employed by this janitorial service in November 1988. Wuellner testified defendant received a paycheck on November 10, two days before the robbery at the liquor store. Wuellner testified defendant netted $159.54 and co-defendant netted $155.75 for a total amount of $315.29.

Defendant's theory of the case was mistaken identification. He offered Wuellner's testimony to explain how defendant had $156.68 on his person when he was apprehended.

## A

During the state's rebuttal closing argument the prosecutor argued:

[PROSECUTOR]: I ask you, focus on the big issue, ladies and gentlemen. Do not be confused by what Mr. Kessler has told you or what [defense counsel] has told you or through the course of questioning of the State's witnesses. Focus on the big issues. It is their job to confuse you.

MR. KESSLER: Your Honor, I object.

[DEFENSE COUNSEL]: I object to that.

MR. KESSLER: And [prosecutor] knows—she knows that that's a misstatement of my function. My function is to preserve my client's constitutional rights.

THE COURT: The objection will be overruled. The jury will remember this is closing argument.

[PROSECUTOR]: It's his job to raise a reasonable doubt in your minds. But, ladies and gentlemen, there is no reasonable doubt as to the identification. Virginia Connor says she identified Michael Clark as the man that held the gun on her beyond all doubt. She testified that [defendant] was the man who pulled the money from her cash register drawer beyond all doubt. Don't be fooled by the flimsy innuendoes and the arguments that they're making that are trying to divert your attention from the big issue, ladies and gentlemen.

Clearly, the prosecutor misstated the law and the facts. Defense counsel's legal duty is to "faithfully, honestly and consistently represent the interests, and protect the rights, of his client." *Laughlin v. Boatmen's Nat. Bank of St. Louis*, 163 S.W.2d 761, 765 (Mo.1942). "It is the duty of a lawyer to act with competence and proper care and represent a client zealously." *In The Matter of Alpers*, 574 S.W.2d 427, 428 (Mo. banc 1978). *See also* Preamble: A Lawyer's Responsibilities, Rule 4. Rules of Professional Conduct. The prosecutor also was arguing falsely that defense counsel's "job" [duty] was to confuse the jury. Thus, the court erred when it overruled counsels' objections.

"However, error, which in a close case might call for reversal, may be disregarded as not prejudicial when evidence of guilt is strong." *State v. Caudill*, 789 S.W.2d 213, 216–7 (Mo.App.1990). Here the collective evidence of guilt is very strong. The elements of the robbery were proven by more than one source. The evidence of guilt consists of the identification by the victim and a customer who appeared on the scene as the defendants were leaving the store. Defendants were apprehended shortly after the robbery in the nearby vicinity carrying cash substantially identical in amount and denomination of the cash taken from the liquor store. The record does not demonstrate defendant was prejudiced by the argument where the evidence of guilt was so strong.

## B

The next complained of argument is:

[PROSECUTOR]: And that these two black men that are caught up here [pointing to a map] match the description of the individuals down here. Each and every one of you ladies and gentlemen should be offended by this—by the argument of defense counsel—

MR. KESSLER: Your Honor, I object to that.

[DEFENSE COUNSEL]: I'm going to object to that.

MR. KESSLER: She wants to have some personal attacks—

THE COURT: Be overruled. The jury will remember this is argument.

[PROSECUTOR]: Should be offended by their argument that this is a racial case.

The state argues this was proper rebuttal argument to defense counsel's argument which defense counsel "implied that the identification was inherently suggestive due to the racial makeup of the defendants, the victim and witness, and the arresting officers, and implied that the defendants were on trial simply because of the color of their skin." We disagree. Defense counsel argued the show-up and subsequent in-court identifications were inherently suggestive and unreliable because defendant

and co-defendant were the only black males present. Defense counsel was properly arguing the evidence and verbal attacks on counsel were unwarranted.

A proper rebuttal argument would have pointed out the facts to the jury which supported the state's position the show-up was not inherently suggestive. However, we find no manifest injustice or miscarriage of justice resulted from this erroneous ruling. The argument as a matter of plain error is denied.

### C

■ Finally, defendant alleges the court erred in overruling his objection to prosecutor's argument asking the jury to consider whether they would cash their paychecks in the denominations found on defendant. The record indicates the court sustained an objection to prosecutor's argument asking the jury how many of them cash their checks in the denominations found on defendant. We find no error prejudicial to defendant surrounding this argument or the court's rulings for several reasons. First, defendant's initial objections were based upon grounds of equal access by the state to witness Wuellner. Second, the court sustained an objection on the grounds of personalizing to the jury. Finally, we find defense counsel's closing argument invited the state's argument which asked the jury to call upon their everyday experiences when they received the case for deliberation. Accordingly, this claim of plain error is denied.

### III

■ Defendant alleges the court erred in overruling his motion to suppress identification and his objections to the out-of-court and in-court identifications of defendant by Ms. Connor and John Walker on the grounds the identifications were a product of impermissible pretrial procedure and unreliable.

Defendant argues the following factors made the show-up identification unreliable and suggestive.

1. Defendants were the only black men at the show-up;

2. They were surrounded by five or six white armed police officers, one holding a shotgun;

3. Defendants were handcuffed, lying face down on the ground and were dragged to their feet as the witnesses drove up;

4. The show-up occurred at dusk, on a cloudy day through a rolled up window;

5. The police told the witnesses they had some suspects for them to identify; and

6. One of the witnesses had the benefit of hearing the other speak first.

We set forth the law regarding the determination of the admission of pretrial and in-court identification in *State v. Harding*, 734 S.W.2d 871, 873 (Mo.App.1987).

Reliability, not suggestiveness, "is the linchpin in determining the admissibility of identification testimony" ... *State v. Higgins*, 592 S.W.2d 151, 160 (Mo. banc 1979). Where a pretrial identification occurs the court will first consider whether that event was impermissibly suggestive, *State v. Toney*, 680 S.W.2d 268, 275 (Mo. App.1984), and thereafter, consider the reliability of the in-court identification. *State v. Toney*, 680 S.W.2d at 275. Reliability involves a consideration of the opportunity of the witness to view the actor at the time of the crime; the degree of attention exercised; the accuracy of a prior description; the level of certainty demonstrated by the witness; and, the length of time between the crime and the confrontation when identification occurs. *State v. Higgins*, 592 S.W.2d at 160.

Connors' and Walker's testimony supports a finding their identification of defendant was based upon their own individual observations and recollections, independent of any suggestive procedures. Additionally, their testimony supports a finding their identifications of defendant's face were reliable. Connors identified defendant spontaneously at the show-up. Connors testified she watched the robbers from the moment they entered the liquor store until they told her to lie on the floor behind the cash register. She had reason to observe

defendant because she did not recognize him and this made her nervous and scared.

Walker told the police officers he could not place defendant in the liquor store; however, defendant was one of the two individuals he saw outside the store. Walker viewed defendant on three separate occasions. Initially, Walker viewed defendant in the store before he was aware of the robbery. Walker viewed defendant two times after he learned of the robbery and was attempting to find a telephone to notify the police. Walker's observations after the robbery were under circumstances which established a high degree of attention and concentration.

Defendant in his brief concedes the descriptions broadcast over the police radio were generally accurate. Prior to trial, both witnesses accurately described defendant and exhibited a high level of certainty in their identifications. Finally, both witnesses confronted defendant and identified him within a half an hour of the robbery. The court did not err in permitting evidence of the out-of-court and in-court identifications for the jury's consideration. Moreover, any conflict or inconsistency in the statements made by the witnesses, as well as the factors analyzed above, were the subject of adequate cross-examination. Point denied.

We affirm.

SMITH, P.J., and AHRENS, J., concur.